## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

ROBERTO ALVAREZ,

        Plaintiff,

vs.

EQUIFAX INFORMATION SERVICES, LLC,
EXPERIAN INFORMATION SOLUTIONS
INC., and TRANS UNION LLC,

        Defendants.

Case No.: 1:25-cv-21795

**JURY TRIAL DEMANDED**

## COMPLAINT

Roberto Alvarez ("Plaintiff" or "Mr. Alvarez") brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union LLC ("Trans Union") (collectively "Defendants") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendants' mixing Plaintiff's credit file with another consumer.

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making

by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendant acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.    Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.    "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.    Congress made the following findings when it enacted the FCRA in 1970:

(a) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c) Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.      Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."   15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

3

10.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16. "Mixed files" create a false description and representation of a consumer's credit history.

17. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18. Mixed files are not a new phenomenon. Defendants have been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19. More recently, Defendants have been the subject of numerous state attorney general actions relating to their mixed file problem.

20. For example, in 2015, the New York Attorney General filed charges and settled claims with Defendants over mixed files.[1]  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

21. Notwithstanding Defendants' notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22. Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also*  Last visited May 17, 2022.

those consumers applies for credit, housing, insurance, or employment, and Defendant sells information pertaining to one consumer in response to the application of the other.

23.     Defendants have been sued thousands of times wherein an allegation was made that Defendants violated the FCRA.  Moreover, Defendants are sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendants mixed a consumer's credit file with that of another consumer.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.  Despite the verdict, Defendants continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.  Despite the verdict, Defendants continues to mix consumers' credit files with other consumers' credit files.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.

Despite the verdict, Defendants continue to mix consumers' credit files with other consumers' credit files.

28.    More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone.  *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom*.  *Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendants continue to mix consumers' credit files with other consumers' credit files.

29.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law."  *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA).  Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendants, to review their procedures when a mixed file occurs.

32.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.     Plaintiff's claims arise out of the Defendants' blatantly inaccurate credit reporting, wherein Defendants published in a consumer report about Plaintiff the information of another consumer because Defendants mixed Plaintiff's credit file with that of an unrelated consumer.

34.     Further, Plaintiff's claims also arise out of Defendants' blatantly inaccurate credit reporting, wherein Defendants permitted impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to a credit application submitted by and pertaining to an unrelated consumer because Defendant mixed Plaintiff's credit file with that of an unrelated consumer.

35.     Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i; and for selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer, in violation of the FCRA, 15 U.S.C. § 1681b(a).

36.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

37.     Roberto Alvarez ("Plaintiff" or "Mr. Alvarez") is a natural person residing in Hialeah Gardens, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38.     Defendant Experian Information Solutions, Inc. ("Defendant" or "Experian") is a corporation with a principal place of business located at 475 Anton Blvd, Costa Mesa, California 92626 and can be served through its registered agent CT Corporation System, 330 North Brand Boulevard, Glendale, California 91203, and is authorized to do business in the State of Florida, including within this District.

39.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

40.     The information Experian collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  Experian also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

41.     Experian collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Experian collects and maintains information about them.  Not only that, but consumers cannot remove information that Experian collects and maintains about them from the Experian database. Further, Experian sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Experian sold.

42.     Defendant Equifax Information Services, LLC ("Defendant" or "Equifax") is a corporation with a principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309 and can be served through its registered agent Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092, and is authorized to do business in the State of Florida, including within this District.

43.     Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

44.     The information Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

45.     Equifax collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Equifax collects and maintains information about them.  Not only that, but consumers cannot remove information that Equifax collects and maintains about them from the Equifax database. Further, Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Equifax sold.

46.     Defendant Trans Union LLC ("Defendant" or "Trans Union") is a corporation with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661 and can be served through its registered agent Illinois Corporation Service Company, 801 Adlai Stevenson

Drive, Springfield, Illinois 62703, and is authorized to do business in the State of Florida, including within this District.

47.     Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

48.     The information Trans Union collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  Trans Union also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

49.     Trans Union collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Trans Union collects and maintains information about them.  Not only that, but consumers cannot remove information that Trans Union collects and maintains about them from the Trans Union database. Further, Trans Union sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Trans Union sold.

## JURISDICTION AND VENUE

50.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

51.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

52.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

53.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

54.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information.  *See* 15 U.S.C. § 1681(b).

55.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

56.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANTS' PROCESSING OF CREDIT INFORMATION

57.     Defendants regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

58.     These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

59.     Defendants collect information from thousands of furnishers.

60.     The process by which Defendants receive, sort, and store information is largely electronic.

61.     Furnishers report credit information to Defendants through the use of coded tapes that are transmitted to Defendant on a monthly basis through software known as Metro 2.

62.     Defendants take credit information reported by furnishers and create consumer credit files.

63.     Defendants maintain credit files on more than 200 million consumers.

64.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**DEFENDANTS' MIXED FILE PROBLEM**

65.     Defendants know that different consumers have similar names.

66.     Defendants know that different consumers can have similar Social Security numbers.

67.     Defendants know that different consumers with similar names can also have similar Social Security numbers.

68.     Defendants know that public records often do contain identifying information such as Social Security numbers or dates of birth.

69.     Defendants match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

70.     Defendants accomplish this matching credit information to consumer credit files through the use of certain matching algorithms or database rules.

71.     From time to time, Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known in the credit reporting industry as a mixed or merged credit file.

72.     Mixed files are not a new phenomenon.  In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendants, regarding its significant failures and deficiencies with respect to mixed files.

73.     Despite Defendants' long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendants containing information belonging to another consumer.

74.     A mixed or merged credit file is the result of Defendants' inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

75.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendants to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

76.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendants.

77.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendants.

78.     Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

79.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

//

## **FACTUAL ALLEGATIONS**

### **Plaintiff Discovers "Mixed" Information in his Experian Credit File**

80.     In or around 2013, Plaintiff experienced financial problems that resulted in him having to file for bankruptcy in 2014.  Since filing for bankruptcy, Plaintiff has been diligent in ensuring his credit and finances remain in good standing.  As such, Plaintiff has been reviewing his credit file and credit card statements often to ensure there are no issues.

81.     In 2024, in preparation of purchasing a home, Plaintiff began searching for potential homes to purchase and more diligently monitoring his credit to ensure that his credit was in good standing.

82.     On or about September 2, 2024, Plaintiff reviewed his Experian credit report, and everything appeared to be accurate and Plaintiff's credit score was at 745.

83.     On or about September 5, 2024, Plaintiff checked his Experian credit report again and was shocked to see that his credit score was 643. This was a 111-point difference from when he checked his credit score three days earlier.

84.     Plaintiff also was extremely upset and distressed to discover several accounts and personal identifying information listed on his September 5, 2024, Experian credit report that he did not recognize and did not belong to him.

85.     Under Personal Information the following name was listed: Roberto A. Resendiz. Plaintiff has never gone by the name Resendiz in his life.

86.     Further, the following address were listed that Plaintiff has never lived at or been associated with:

(a)     ▮▮▮▮▮▮▮ Toughkenamon, Pennsylvania 19374-0064

(b)     ▮▮▮▮▮▮▮ Lincoln, Delaware 19960-2812

(c)     ▮▮▮▮▮▮▮▮ Wilmington, Delaware, 19805-1001.

87.     Plaintiff has never lived in Pennsylvania or Delaware.

88.     In addition to the personal identification information, Defendant Experian reported the following accounts which did not belong to Plaintiff:

(a)     Caine & Weiner
        Account Number: 178779**
        Date Opened: April 26, 2021
        Balance: $1,882
        Status: Collections Account. Past Due.
        Original Creditor: Progressive

(b)     Capital One
        Account Number: 517805******
        Date Opened: January 7, 2018
        Balance: $4,237
        Status: Open/Never Late

(c)     Capital One
        Account Number: 515676******
        Date Opened: February 18, 2022

Balance: $16,978
Status: Account charged off.  Past Due.

(d)   CBNA
Account Number: 603533*********
Date Opened: April 2, 2021
Balance: $0
Status: Paid, Closed/Never Late

(e)   CitiCards/CBNA
Account Number: 542418******
Date Opened: February 7, 2020
Balance: $1,005
Status: Open/Never Late

(f)   FINBE USA
Account Number: 112149***
Date Opened: August 17, 2019
Balance: $4,909
Status: Open/Never Late

(g)   SYNCB/AMERICAN SIGNATU
Account Number: 601919******
Date Opened: December 4, 2022
Balance: $1,018
Status: Closed/Never Late

(h)   SYNCB/CUTTING EDGE
Account Number: 603462******
Date Opened: February 10, 2019
Balance: $3,277
Status: Opened/Never Late

(i)   SYNCB/LOWES
Account Number: 798192******
Date Opened: October 7, 2021
Balance: $1,787
Status: Closed/Never Late

(j)   TBOM/ATLS/FORTIVA
Account Number: 765650*********
Date Opened: September 21, 2020
Balance: $0
Status: Opened/Never Late

(k)   THD/CBNA
Account Number: 603532*********
Date Opened: November 18, 2018
Balance: $280

Status: Opened/Never Late

(l)      Truist Bank
Account Number: 461608**********
Date Opened: May 9, 2017
Balance: $292
Status: Open.

(m)     United Auto Credit Co
Account Number: 100101**********
Date Opened: November 15,2019
Balance: $0
Status: Paid, Closed/Never Late

89.     By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant Experian failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's September 2024 Disputes to Defendant Experian**

90.     On or about September 5, 2024, worried that something was very wrong with his credit file, Plaintiff tried to dispute online with Defendant Experian.  However, Experian.com would only allow Plaintiff to dispute telephone numbers and some addresses, which he did.

91.     On or about September 5, 2024, Plaintiff also called Experian to dispute the information that did not belong to him via telephone.  Plaintiff went over each account and personal information that did not belong to him with the Experian representative.

92.     Plaintiff requested that Defendant reinvestigate the disputed information and correct the reporting.

### The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

93.     The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

94.     The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

95.     That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

96.     It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

97.     Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

98.     Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

99.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

100.     These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

101.     Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

102.    The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

103.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and returning the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Experian's Unreasonable Dispute Reinvestigation**

104.    On or about September 12, 2024, Plaintiff received a dispute response from Experian.  Experian removed the following telephone numbers from his report: ███-5065, ███-5070 and ███-2422.  Experian also removed the following addresses: ███ Miami, FL 33130 and c/o ███ Orlando, FL 32896.



105.    Defendant Experian did not remove the employer listed as: Roberto Alvarez. Defendant also did not remove the following address: ███ Wilmington, DE 19805.

106.    On or about September 24, 2024, Plaintiff received a second dispute response from Defendant Experian.  Defendant Experian removed the following additional telephone numbers: ███-4711, ███-8982, ███-7411, ███-6921, ███-1072.

107.    On or about September 24, 2024, Plaintiff again disputed the accounts that did not belong to him via telephone with Defendant Experian.

108.    On or about September 27, 2024, Plaintiff received a third dispute letter from Defendant Experian.  Experian removed the following accounts from Plaintiff's credit file:

(a)     THD/CBNA
        Account Number: 603532**********
        Date Opened: November 18, 2018
        Balance: $280
        Status: Opened/Never Late

(b)     FINBE USA
        Account Number: 112149***
        Date Opened: August 17, 2019
        Balance: $4,909
        Status: Open/Never Late

(c)     SYNCB/CUTTING EDGE
        Account Number: 603462******
        Date Opened: February 10, 2019
        Balance: $3,277
        Status: Opened/Never Late

109.    Defendant Experian also removed the following address: ██████████

██████ Woodland Hills, CA 91367.

110.    Defendant Experian further removed the employer listed as: Alvarez Landscaping.

111.    Additionally, Defendant Experian removed the name: Roberto Resendiz-Alvarez.

112.    Defendant Experian verified the following accounts as accurate and continued to

report:

(a)     Caine & Weiner
        Account Number: 178779**
        Date Opened: April 26, 2021
        Balance: $1,882
        Status: Collections Account. Past Due.
        Original Creditor: Progressive

(b)     TBOM/ATLS/FORTIVA
        Account Number: 765650**********
        Date Opened: September 21, 2020
        Balance: $0
        Status: Opened/Never Late

(c)     United Auto Credit Co
        Account Number: 100101**********
        Date Opened: November 15,2019

Balance: $0
Status: Paid, Closed/Never Late

(d)    SYNCB/LOWES
Account Number: 798192******
Date Opened: October 7, 2021
Balance: $1,787
Status: Closed/Never Late

(e)    Capital One
Account Number: 517805******
Date Opened: January 7, 2018
Balance: $4,237
Status: Open/Never Late

(f)                      Capital One
Account Number: 515676******
Date Opened: February 18, 2022
Balance: $16,978
Status: Account charged off.  Past Due.


(g)    CitiCards/CBNA
Account Number: 542418******
Date Opened: February 7, 2020
Balance: $1,005
Status: Open/Never Late

(h)    Truist Bank
Account Number: 461608*********
Date Opened: May 9, 2017
Balance: $292
Status: Open.

(i)    SYNCB/AMERICAN SIGNATU
Account Number: 601919******
Date Opened: December 4, 2022
Balance: $1,018
Status: Closed/Never Late

(j)    CBNA
Account Number: 603533*********
Date Opened: April 2, 2021
Balance: $0
Status: Paid, Closed/Never Late

113.    Upon receipt of Plaintiff's September disputes, Defendant Experian was required to send a dispute notice, including but not limited to an ACDV, to the furnishers regarding credit accounts disputed by Plaintiff:

114.    Defendant Experian either failed to send a dispute notice, including but not limited to an ACDV, to the furnishers or the furnishers verified to Defendant Experian that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's credit report and/or in Plaintiff's credit file.

115.    Defendant Experian failed to conduct a reasonable investigation of Plaintiff's September 2024 disputes, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Plaintiff's December 2024 Dispute to Experian**

116.    On October 6, 2024, Plaintiff obtained his Experian credit report.  Plaintiff was upset to see most of the accounts and personal information that did not belong to him was still reporting on his credit report.

117.    Specifically, all the accounts that were verified as accurate continued to be reported.

118.    Also, the following name variations that Plaintiff never used continued to report: Roberto Alvarezresendiz, Roberto A Resendiz, and Roberto Alvarez Resendi.

119.    Further, the following addresses that Plaintiff has no association with continued to report: ███████ Toughkenamon, PA 19374-0064; ███████ Lincoln, DE 19960-2812; and ███████ Wilmington, DE 19805-1001.

120.    On or about December 26, 2024, Plaintiff sent another dispute to Defendant Experian, this time via certified mail.

121.    In his dispute letter Plaintiff specifically mentioned the accounts and personal identifying information that did not belong to him.  Further, Plaintiff included a copy of his license and social security card to help Defendant Experian identify his credit file.

122.    On or about December 30, 2024, Plaintiff contacted Experian via telephone to follow up on his written dispute, but the Experian representative explained that Experian had not yet received his dispute letter.

123.    Defendant Experian received Plaintiff's dispute letter on or about January 2, 2025.

124.    On February 3, 2025, Plaintiff obtained his updated Experian credit report.

125.    Upon review of Plaintiff's February 3, 2025 Experian credit report, Defendant Experian removed the following name variations that do not belong to Plaintiff: Roberto Alvarez Resendiz and Roberto Alvarez Resendi.

126.    Defendant Experian also removed the following addresses that did not belong to Plaintiff: ███████████ Lincoln, Delaware 19960-2812 and ██████████████ Wilmington, Delaware 19805.

127.    Further Defendant Experian removed the following account that did not belong to Plaintiff:

> Caine & Weiner
> Account Number: 178779**
> Date Opened: April 26, 2021
> Balance: $1,882
> Status: Collections Account. Past Due.
> Original Creditor:  Progressive

128.    Plaintiff was disappointed to see the following name variation he disputed as not belonging to him remained in his February 3, 2025, Experian credit report: Roberto A Resendiz.

129.    Additionally, the following address that Plaintiff did not recognize and has no association with remained in his Experian credit report: ███████ Toughkenamon, PA 19374-0064.

130.    Further to Plaintiff's shock the following accounts which he disputed as not belonging to him remained in his Experian credit report:

      (a)    Capital One
            Account Number: 517805******
            Date Opened: January 7, 2018
            Balance: $4,748
            Status: Open/Never Late

      (b)    Capital One
            Account Number: 515676******
            Date Opened: February 18, 2022
            Balance: $16,412
            Status: Account charged off.  $16,978 written off.  $16,412 Past Due as of January 2025.

      (c)    CBNA
            Account Number: 603533*********
            Date Opened: April 2, 2021
            Balance: $0
            Status: Paid, Closed/Never Late

      (d)    CitiCards/CBNA
            Account Number: 542418******
            Date Opened: February 7, 2020
            Balance: $1,445
            Status: Open/Never Late

      (e)    SYNCB/AMERICAN SIGNATU
            Account Number: 601919******
            Date Opened: December 4, 2022
            Balance: $823
            Status: Closed.  $237 past due as of January 2025.

      (f)    SYNCB/LOWES
            Account Number: 798192******
            Date Opened: October 7, 2021
            Balance: $1,366
            Status: Closed/Never Late

(g)    TBOM/ATLS/FORTIVA
       Account Number: 765650**********
       Date Opened: September 21, 2020
       Balance: $0
       Status: Paid, Closed/Never Late

(h)    Truist Bank
       Account Number: 461608**********
       Date Opened: May 9, 2017
       Balance: $473
       Status: Open.

(i)    United Auto Credit Co
       Account Number: 100101**********
       Date Opened: November 15,2019
       Balance: $0
       Status: Paid, Closed/Never Late

131.   Moreover, Experian added an address that does not belong to Plaintiff after the

dispute: ███████████ Toughkenamon, PA 19374.

132.   Defendant Experian also verified as accurate Plaintiff's Merrick Bank Corporation

account which does in fact belong to Plaintiff.   Plaintiff never disputed the Merrick Bank

Corporation account since it does belong to him.

133.   Upon receipt of Plaintiff's December dispute, Defendant Experian was required to

send a dispute notice, including but not limited to an ACDV, to the furnishers regarding credit

accounts disputed by Plaintiff:

134.   Defendant Experian either failed to send a dispute notice, including but not limited

to an ACDV, to the furnishers or the furnishers verified to Defendant Experian that the disputed

information belonged to Plaintiff and was accurately reporting on Plaintiff's credit report and/or

in Plaintiff's credit file.

135.   Defendant Experian failed to conduct a reasonable investigation of Plaintiff's

December 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed

information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

136.    Thereafter, and upon information and belief, Defendant Experian failed to unmix Plaintiff's credit file from that of the other consumer and likely Defendant continued to report the other consumer's information to Plaintiff's credit file.

137.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

138.    Upon information and belief, because Defendant Experian continues to mix Plaintiff's credit file with that of the unrelated consumer, Defendant Experian continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

139.    As a result of Defendant Experian's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

### Plaintiff Reviews his April 2025 Experian Credit Report

140.    On or about April 7, 2025, Plaintiff reviewed his Experian Credit Report.

141.     All the personal identifying information and accounts that did not belong to Plaintiff that were included on Plaintiff's February 3, 2025 Experian credit report continued to report on Plaintiff's April 7, 2025 credit report.

142.     Moreover, Defendant Experian added the Caine & Weiner Collections account, Account number 178779**, Date opened April 26, 2001, Balance $1,882, Original Creditor Progressive, back into Plaintiff's credit file.

143.     Upon information and belief, as of the date of this filing, Defendant Experian continues to mix Plaintiff's credit file with that of the unrelated consumer.

//

### Plaintiff's Trans Union Mixed File

144.     On or about September 30, 2024, concerned about the state of his credit file Plaintiff called Trans Union to see if the mixed issue was happening with his Trans Union credit file as well.

145.     The Trans Union representative that Plaintiff spoke to stated that it appeared that Plaintiff's social security number was associated with two credit files and that they would correct the situation.

146.     On or about October 21, 2024, Plaintiff secured a copy of his Trans Union credit report from annualcreditreports.com.

147.     Upon reviewing the contents of the October 21, 2024, credit file, Plaintiff was distressed to see that Defendant Trans Union was reporting several accounts and the personal identifying information of an unrelated consumer to Plaintiff's credit file.

148.     Defendant Trans Union was reporting the following addresses that Plaintiff did not recognize and has no association with:

(a)     ▮▮▮▮▮▮▮ Toughkenamon, PA 19374-0064

(b)  Wilmington, DE 19805-1001

(c) Toughkenamon, PA 19374-1024

(d) Toughkenamon, PA 19374

(e) Lincoln, DE 19960-2812

(f) Hialeah, FL 33018

149.    Defendant Trans Union was also reporting the following telephone numbers that do not belong to Plaintiff:

(a) -5065

(b) -5070

(c) -4711

(d) -7411

(e) -3960

(f) -0553

(g) -4454

(h) -8651

(i) -0798

150.    Further Defendant Trans Union was reporting the following employment history that does not belong to Plaintiff:

(a)    Alvarez Landscaping

(b)    Roberto Alvarez

(c)    Alvarez Services

(d)    Simtec Chemical Part

(e)    Sintec Silicon

151.    Moreover, Defendant Trans Union was reporting the following accounts that did

not belong to Plaintiff:

(a)    Caine & Weiner
Account Number 1787****
Date Opened: April 26, 2021
Balance: $1,882

(b)    Capital One
Account Number 517805831829****
Date Opened: January 7, 2018
Balance: $4,079
Status: Open/Never late

(c)    Capital One
Account Number 515676775624****
Date Opened: February 18, 2022
Balance: $16,978
Status: Charge of

(d)    TOROEXMARK/CBNA
Account Number 603533300640****
Date Opened: April 2, 2021
Balance: $0
Status: Paid, Closed/Never late

(e)    CitiCards/CBNA
Account Number 542418165858****
Date Opened: February 7, 2020
Balance: $1,119
Status: Open/Never late

(f)    FINBE USA
Account Number 00114****
Date Opened: August 17, 2019
Balance: $3,570
Status: Open/Never late

(g)    SYNCB/AMERICAN SIGNATURE
Account Number 601919382047
Date Opened: December 4, 2022
Balance: $889
Status: Closed/Never late

(h)    SYNCB/CUTTING EDGE
Account Number 603462082613****

Date Opened: February 10, 2019
Balance: $2,978
Status: Open/Never late

(i)     SYNCB/LOWES
        Account Number 798192739046****
        Date Opened: October 7, 2021
        Balance: $1,564
        Status: Closed/Never late

(j)     TBOM/FORTIVA
        Account Number 765650200632****
        Date Opened: September 21,2020
        Balance: $0
        Status: Open/Never late

(k)     THD/CBNA
        Account Number 603532111955****
        Date Opened: November 18, 2018
        Balance: $170
        Status: Open/Never late

(l)     Truist Bank
        Account Number 461608111553****
        Date Opened: May 9, 2017
        Responsibility: Joint Account
        Balance: $369
        Status: Open.

(m)     United Auto Credit
        Account Number 1001011610851****
        Date Opened:  November 15, 2019
        Balance: $0
        Status: Paid, Closed/Never late

152.    Plaintiff also discovered a Hard Inquiry being reported that he did not recognize

and does not have an account with: SYNCB/LOWES - July 27, 2023.

153.    By reporting the aforementioned credit accounts and other personal information in

the credit file presumably about Plaintiff, despite the fact that the accounts and information do not

belong to Plaintiff, Defendant Trans Union failed to follow reasonable procedures to assure the

maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff's December Dispute to Trans Union**

154.    On December 26, 2024, Plaintiff sent a dispute to Defendant Trans Union via certified mail.

155.    In his dispute letter Plaintiff specifically mentioned the accounts and personal identifying information that did not belong to him.  Further, Plaintiff included a copy of his license and social security card to help Defendant Experian identify his credit file.

156.    Upon information and belief, Defendant Trans Union received Plaintiff's dispute letter on December 30, 2024.

157.    Upon information and belief, Plaintiff never received a dispute response letter from Defendant Trans Union.

158.    On or about February 4, 2025, Plaintiff obtained an updated copy of his Trans Union credit report.

159.    Upon reviewing the February 4, 2025, Trans Union credit report, Plaintiff saw that Defendant Trans Union removed most of the disputed information.  However, the name variation, Roberto Alvarez Resendiz continued to report.

160.    Also, Trans Union continued to report the Hard Inquiry, SYNCB/LOWES - 07/27/2023.

161.    Defendant Trans Union failed to conduct a reasonable investigation of Plaintiff's dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

162.     Thereafter, and upon information and belief, Defendant Trans Union failed to unmix Plaintiff's credit file from that of the other consumer and likely Defendant continued to report the other consumer's information to Plaintiff's credit file.

163.     Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

164.     Upon information and belief, because Defendant Trans Union continues to mix Plaintiff's credit file with that of the unrelated consumer, Defendant Trans Union continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

165.     As a result of Defendant Trans Unions' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

**Plaintiff Reviews his April 2025 Trans Union Credit Report**

166.     On or about April 8, 2025, Plaintiff reviewed his Trans Union Credit Report.

167.     The name variation Roberto Alvarez Resendiz that Plaintiff never used and included in his December 2024 dispute letter continued to report.

168.    Also, Trans Union continued to report the Hard Inquiry, SYNCB/LOWES -
07/27/2023 which does not belong to Plaintiff and which Plaintiff disputed in his December 2024
dispute letter.

169.    Upon information and belief, as of the date of this filing, Defendant Trans Union
continues to mix Plaintiff's credit file with that of the unrelated consumer.

**Plaintiff's Equifax Mixed File**

170.    On or about October 6, 2024, Plaintiff concerned with the state of his credit file
requested his Equifax credit report from annualcreditreports.com to see if Equifax was also
including information of an unrelated consumer in his credit file.

171.    After reviewing his Equifax credit report, Plaintiff was upset to see Defendant
Equifax was also reporting several accounts and personal identifying information that does not
belong to him.

172.    Defendant Equifax was reporting the following addresses that do not belong to
Plaintiff:

　　　　(a)　　　　███████████████ Wilmington, DE  19805

　　　　(b)　　　　███████████ Toughkenamon, PA  19374

173.    Defendant Equifax was also reporting the following employment history that does
not belong to Plaintiff: Simtec Chemical Part (Supervisor).

174.    Moreover, Defendant Equifax was reporting the following accounts that do not
belong to Plaintiff:

　　　　(a)　　　　TBOM/FORTIVA
　　　　　　　　　Account Number: ending in *6356
　　　　　　　　　Date Opened: September 21, 2020
　　　　　　　　　Balance: $80
　　　　　　　　　Status:  Pays as Agreed

　　　　(b)　　　　THD/CBNA
　　　　　　　　　Account Number: ending in *5726

Date Opened: November 18, 2018
Balance: $220
Status:  Pays as Agreed

(c)    CitiCards/CBNA
Account Number: ending in *4680
Date Opened: February 7, 2020
Balance: $1,172
Status:  Pays as Agreed

(d)    THD/CBNA
Account Number: ending in *9603
Date Opened: November 18, 2018
Balance: $0
Status:  Pays as Agreed

175.    By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant Equifax failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

//

**Plaintiff's December 2024 Dispute to Defendant Equifax**

176.    On or about December 26, 2024, Plaintiff sent a dispute via certified mail to Defendant Equifax.  Plaintiff included a copy of his driver's license and social security card to help Defendant Equifax locate his credit file.

177.    In his dispute letter, Plaintiff specifically disputed the personal identifying information and accounts that did not belong to him.

178.    Upon information and belief Defendant Equifax received Plaintiff's dispute letter on December 29, 2024.

179.    According to Plaintiff's MyEquifax, the dispute was submitted on January 6, 2025, and the dispute reinvestigation was completed on January 15, 2025.

180.    On or about February 4, 2025, Plaintiff obtained a copy of his credit report from Defendant Equifax.

181.    Upon reviewing his February 4, 2025, Equifax credit report Plaintiff was shocked to see that only one piece of the information he disputed was removed, the address ███████ ██ Hialeah, FL 33018-4161.   This is Plaintiff's actual address; Plaintiff was only disputing because it was misspelled.

182.    All the other personal identifying information and accounts that did not belong to Plaintiff continued to be reporting on his Equifax credit report.

183.    Defendant Equifax also verified as accurate Plaintiff's Merrick Bank Corporation account which does in fact belong to Plaintiff.   Plaintiff never disputed the Merrick Bank Corporation account since it does belong to him.

184.    Upon receipt of Plaintiff's December 2024 dispute, Defendant Equifax was required to send a dispute notice, including but not limited to an ACDV, to the furnishers regarding the credit accounts disputed by Plaintiff.

185.    Defendant Equifax either failed to send a dispute notice, including but not limited to an ACDV, to the furnishers or the furnishers verified to Defendant Equifax that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's credit report and/or in Plaintiff's credit file.

186.    Defendant Equifax failed to conduct a reasonable investigation of Plaintiff's December 2024 dispute, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

187.    Thereafter, and upon information and belief, Defendant Equifax failed to unmix Plaintiff's credit file from that of the other consumer and likely Defendant Equifax continued to report the other consumer's information to Plaintiff's credit file.

188.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

189.    Upon information and belief, because Defendant Equifax continues to mix Plaintiff's credit file with that of the unrelated consumer, Defendant Equifax continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to the unrelated consumer.

### Plaintiff Reviews his April 2025 Equifax Credit Report

190.    On or about April 17, 2025, Plaintiff reviewed his Equifax Credit Report.

191.    All the personal identifying information and accounts that did not belong to Plaintiff that were included on Plaintiff's February 4, 2025 Equifax credit report continued to report on Plaintiff's April 17, 2025 credit report.

192.    Upon information and belief, as of the date of this filing, Defendant Equifax continues to mix Plaintiff's credit file with that of the unrelated consumer.

193.    As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit

applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

194.    As a result of the "mixed file," Defendants have made it practically impossible for Plaintiff to obtain credit.

195.    Plaintiff noticed that his Progressive Insurance six-month premium rates increased from $1,085 for April 2024 to October 2024 to $1,676 for October 2024 to April 2025.  Upon information and belief, the inaccurate credit reporting is the reason for the increase.  There is a corresponding inquiry on Plaintiff's Equifax and Experian credit reports.  Plaintiff was not in any accidents or had any traffic violations that could account for the increase.

196.    On or about October 22, 2024, Plaintiff applied to get pre-approval for a Capital One credit card and was denied. Upon information and belief, Capital One obtained Plaintiff's credit information from all three Defendants.

197.    On or about January 7, 2025, Plaintiff received a denial letter from Capital One denying his request to increase his credit line.  The reason for the denial stated, "Your financial obligations reported to us by the credit reporting agency are too high."  Equifax was the credit reporting agency identified as the source in the denial letter.

198.    Plaintiff is now scared to apply for any type of credit, especially a mortgage, since the inaccurate "mixed" reporting has caused his credit score to decrease by over a hundred points.

Plaintiff was excited to purchase a house and now he is worried he is going to miss an opportunity to purchase a new home while waiting for his credit reports to be corrected.

199.    Moreover, Plaintiff, his wife, and five children are currently living with his parents. Not being able to move forward with purchasing a house of their own puts stress on the whole family and strain on Plaintiff's relationship with his parents.

200.    Plaintiff is also worried because he has been accepted at the Police Academy, but part of his acceptance is contingent on his background check which includes pulling Plaintiff's credit file.

201.    Further, Plaintiff's car lease is going to be coming due.  Plaintiff worries about how the derogatory information that doesn't belong to him being reported on his credit reports might affect his ability to continue to lease a car.

202.    Plaintiff is a perfectionist who checks his credit reports regularly.   Having information that doesn't belong to him included on his credit reports is causing Plaintiff much stress and anxiety.  Having his credit score lowered while he is wanting to purchase a home and applying to the police academy is only increasing his stress and anxiety.

203.    Plaintiff has a preexisting heart condition.  The stress from having an unrelated consumer's derogatory accounts reporting on Plaintiff's credit reports has caused him to have heart palpitations.  Plaintiff discussed the situation with his doctor.  Plaintiff's doctor wanted to prescribe him medication, Xanax, to manage his stress and anxiety. However, Plaintiff is already on heart medication and tries to avoid taking additional prescription medication.  As such, Plaintiff's doctor suggested he take Ashwagandha, an over-the-counter supplement that helps with stress and anxiety.   Plaintiff's doctor also showed him breathing exercises that can help reduce stress. Additionally, Plaintiff's doctor mentioned that drinking Chamomile tea can also help reduce stress.

204.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

205.    At all times pertinent hereto, Defendants' conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

206.    As a standard practice, Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrots the response of the credit furnisher, despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

207.    Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, Defendants' violations of the FCRA are willful.

208.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit

applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

**CLAIMS FOR RELIEF**

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

209.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

210.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

211.   On at least one occasion, Defendants prepared patently false consumer reports concerning Plaintiff.

212.   Defendants mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

213. Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintained concerning Plaintiff.

214. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

215. Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

216. Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
## Failure to Perform a Reasonable Reinvestigation

217. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

218.    The FCRA mandates that Defendants conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id.*

219.    The FCRA provides that if Defendants conducts their reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, it is required to delete the item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

220.    Plaintiff initiated a dispute with Defendants and disputed inaccurate information reporting in his credit file and requested that Defendants correct and/or delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

221.    Defendants failed to respond to Plaintiff's disputes and conducted *no* investigation of Plaintiff's disputes, or such investigations, if any, were so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

222.    Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

223.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of his right to keep his private financial information confidential; the loss of his right to information about who was viewing his private financial information and how his private financial information was improperly implicated in the credit

applications of another; damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

224.    Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

225.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendant negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 18th day of April2025,

/s/ *Catherine Tillman*
Catherine Tillman, Esq., FL #0057663
CONSUMER JUSTICE LAW FIRM PLC
8095 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (480) 613-7733
E: ctillman@consumerjustice.com

*Attorneys for Plaintiff*
*Roberto Alvarez*